May I please the court CB Kirshner on behalf of petitioner appellant Mauricio Melendez. I will attempt to reserve three minutes for rebuttal and I will keep track of my time. Okay. The State District Court properly granted relief in this case and the Nevada Supreme Court's reversal was deeply flawed. This court cannot have confidence in the outcome of Mr. Melendez's trial because of the numerous errors made by his attorneys. The errors in this case compounded one another. Specifically, trial counsel's failure to investigate with regards to a forensic expert as well as the witness Eggleston, combined with counsel's failure to challenge the physical evidence by not objecting to Dr. Sims and the autopsy, undoubtedly resulted or at least contributed to the improper concession during closing arguments because the previous errors left little for the defense to argue. The cumulative impact of the errors in this case are particularly prejudicial because the evidence against Mr. Melendez was not overwhelming. The Nevada Supreme Court focused on two areas of evidence, Mr. Melendez's statement to the police as well as his behavior after the crime, excuse me, after the shooting, however, neither of those pieces of evidence actually showed evidence of intent to premeditate or deliberate with regards to this shooting. Furthermore, when looking at the cumulative impact of the errors, this court must consider the alternative. He shot her in the head. The bullet went through the, as I understand it, above the nose and again, the evidence indicated that there were a million safety features on the gun, which were not in place. He told a co-employee that he wanted to kill his wife and that he was unhappily married. I don't quite understand and not to speak of what he did in the aftermath of the shooting, which is not what I have to tell you with the gory details, but, you know, for approximately 16 hours, he didn't call the police. He locked his child in a room. I mean, I don't know how you could say that there was no evidence of intent here. I'm glad your Honor brought those issues up. First of all, the testimony of Melissa Hill, the co-worker, was largely incredible. First, she told the police that she had heard Mr. Melendez make this statement of frustration, is really what she thought it was, on the fifth, a day when they were not working together. Later, other employees, numerous other employees, including supervisors, said that Ms. Hill had a tendency to exaggerate and tell stories just to get attention. So her testimony wasn't particularly credible. With regards to Mr. Melendez, He's testifying on the roof. We're not talking about gossip here. Well, even if Ms. Hill She even says that she told him after he told her that he was going to kill my wife, I'm going to kill my wife. You know, in a way where someone would if they're upset with their spouse, you know, I feel like killing your wife, you know, and I told him you shouldn't say something like that. You know, and he basically told me that he was having some problems at home. And this was testimony that was otherwise Making up a story under oath. Well, she was making up this story before she was even placed under oath. She didn't tell her co workers about this alleged statement. For nearly two weeks after the shooting. And at that point, she was locked into it. She told her co workers. She then had to sit down with the police officers. So by the time she was called testify under oath. She had already made up and told the same story multiple times and was somewhat locked into it. But it was uncooperated. The neighbors on the night in question didn't hear any fighting or arguing going on. The Melendez's son didn't hear any fighting or arguing going on. The apartment was not in disarray. The victim did not have any additional bruises or injuries. The gun go off. Yes, the neighbors heard the gun. Well, I don't know about the neighbors. The son heard the gun go off. Yes, of course. And then he locked the son up. He did. He did not want his son to hear any argument also didn't hear the bullet go off. Gun go off rather I don't believe there was any testimony that the neighbors did hear the gun go off. But with regards to Mr. Melendez his behavior after the crime. Again, it was bizarre behavior, but it did not contain any consciousness of guilt. Mr. Melendez had time if he wanted to actually dispose of the evidence, hide of the evidence, even flee. He had ample opportunity to do that and didn't. His behavior was consistent with someone who was in shock and grief. And his primary concern was to protect his son. So let me just insert something right there. As Judge Corman pointed out, it was about 16 hours after the shooting before he called the police. Or he called 911. I'm sorry. And his the story that he gave to 911 was that he woke up beside his on the floor, on the couch, whatever, on the floor next to the couch. And he observed his wife had been shot with a gun on the table. Suggesting to the 911 operator that she had committed suicide. Later that afternoon, when he has his interview with the police, he tells a different story. The things that Judge Corman pointed out. You know, even if you assume that there might have been some sort of error or ineffective assistance of counsel, say, for example, in conceding to involuntary manslaughter. And even if you assume another one and you get to cumulative error, how do you get over the prejudice? You need to show that it was prejudicial error. I mean, which means under AEDPA, you have to, we would have to conclude that every fair-minded jurist would agree that he suffered a serious due process violation. So that we've been able to conclude that he didn't receive a fair trial. I mean, I don't know. The evidence is very difficult for him, as Judge Corman pointed out. How do you get over prejudice with that? Yes, Your Honor. And first, allow me to address the standard of review. Because the Nevada Supreme Court didn't find any errors, they certainly didn't do an analysis as far as cumulative error. So that problem would actually be reviewed de novo, not under AEDPA deference, because the Nevada Supreme Court didn't address it at all and didn't feel the need to. But the Nevada Supreme Court did say something about cumulative error. So you're interpreting that as only being about whether there were errors, not about prejudice. Is that what you're saying? Yes, Your Honor. But they did find an error in the failure to use an investigator with the sister, right? So there is an error that they at least didn't foreclose because they jumped to prejudice. Yes, Your Honor. But because they didn't find any additional errors, they said there were no errors to accumulate and therefore didn't have to make that analysis. However, under a cumulative error analysis, this court has to look at not only the evidence that was presented, but the totality of it. What evidence would have been presented but for the other errors? So yes, Mr. Melendez's behavior was bizarre. And in his panic, in his grief, in his shock, knowing undoubtedly that husbands are always the first people that the police officers look at, he misspoke or lied when he panicked and called 911. Ultimately, when he spoke to the police, he became more honest about the fact that they had been drinking. He had been showing her how to use this gun. And ultimately, it went off. And indeed, Mr. Melendez's son confirmed that, saying that they had been drinking and that Mr. Melendez was showing his wife how to use the gun. So that was corroborated. But this course also has to look at what if the defense had presented a forensic expert to explain how the physical evidence supported the theory of the defense that the gun went off accidentally? Well, an expert couldn't say it went off accidentally. That's for the jury to decide. An expert could point to certain facts from which that inference could be drawn. But my impression was that in reading the record was that there was no great issue on what the facts were, as opposed to a conclusion about whether it was an accident. That's not entirely accurate, Your Honor. What George Shiro wrote in his report was that the physical evidence made it just as, if not more likely, that the shooting was accidental rather than deliberate. And one of the facts that he took issue with was the state's characterization of the trigger pull of the gun. The state characterized it using this milk jug comparison as far as the effort it would take for the gun to go off whereas Mr. Shiro pointed out that it would be more properly characterized as a hair trigger, making it much more likely that the gun would have gone off with little to no effort if it was being miscounted. But it only went off because he had his finger on the trigger. Well, we don't really know whether or not... He had his finger on the trigger. And, Your Honor, it was actually... I forget about the dispute over how easy it was for the gun to go off, but he had his finger on the trigger. Well, that was the police versions which Mr. Melendez somewhat reluctantly went along with after stating repeatedly that he didn't recall exactly what happened but knew that he hadn't been fighting with his wife, knew that he didn't have any reason to want to harm her, and stated at least a dozen times during his statement that the gun was unloaded, that he personally unloaded it and believed that the gun was unloaded. Well, it wasn't. So it wouldn't have... There was a serious... It's a serious mistake. Your Honor, and it also is not evidence of premeditation and deliberation. This court also should look at what if counsel had properly objected to Dr. Sims being used as a substitute coroner and hadn't stipulated to introduction of the autopsy report. These were critical facts that the state used during their closing arguments. Autopsy reports have shown that that was relevant. The autopsy report showed that the determination was that it was a homicide versus an accident, which was a finding that a coroner can make. Additionally, the autopsy report discussed the trajectory of the bullet, which the state actually used to stage a reenactment during their rebuttal argument. And again, this was not disputed by the defense because they did not present an expert like Shiro to explain how these same physical evidence that came in could equally support a finding that the shooting was accidental rather than intentional. On the concession about manslaughter, I have some confusion about what happened here because it seems that the transcript shows a concession to voluntary manslaughter. But the Nevada Supreme Court talks about a concession to involuntary manslaughter and even your brief references at concession to involuntary manslaughter. Can you clarify what's going on here on this? Why is there this difference? Your Honor, my best guess, and this is because I was not present at the trial, is that defense counsel misspoke and that he did say that Mr. Melendez should be convicted of voluntary manslaughter. Where he probably... So why haven't you argued? I don't understand. That's a much bigger error, right? Because voluntary manslaughter means it's voluntary, not an accident. Involuntary would be less of a contradiction with the rest of the theory. So I don't really read your brief, though, as arguing this point that voluntary manslaughter was a very, very bad thing to say. And I don't understand why not. Like, do you think it's a typo? Why are you talking about involuntary manslaughter? Because the jury was charged on involuntary manslaughter and the jury was not instructed on voluntary manslaughter. But doesn't that just make it an even bigger error? Oh, absolutely. Absolutely. It would have confused the jury. It was never explained. It was never clarified to them. Again, because voluntary manslaughter really involves a set of facts that were not even alleged here. That's why I presume that defense counsel misspoke. But it was a huge error and absolutely would have confused the jury in its own right to say nothing of the fact that it essentially diminished the entire defense that had been presented up until that time. So it was a very significant error, particularly when combined with everything else. Mr. Melendez never agreed to any sort of concession, whether it be to voluntary or involuntary manslaughter. Stated he never would have done that. And the concession undermined the entire theory of the defense and would have permeated the entire trial and deliberations. Can I bring you back to the cumulative error standard of review? Because it took me a moment to find the footnote in question. The footnote says in the Nevada Supreme Court opinion, we also conclude that the district court erred by determining that cumulative error warranted relief. Can you explain? I think when you paraphrased it, it sounded different than that. You made it sound like they were saying there are no errors. And I don't know how you get that from those words. Can you explain how you're interpreting that footnote? I guess it was the interpretation of the footnote combined with the rest of their opinion in which they went through each of the errors that had been found by the district court and determined that no errors had occurred. So reading that in combination with the footnote, I took to mean that they found there were no errors to accumulate. And thus, that's why they reversed in the district court. If I made it sound like there was language in there that wasn't, I do apologize. That certainly wasn't my intention. And if that's true and they didn't reach prejudice, then we would review cumulative error de novo? Yes, Your Honor. But the other errors, you would be saying that they reached prejudice for each of them. So it would be harder to, it's a little bit of an odd thing. We end up deferring on the prejudice for each individual one, but then not on the cumulative. Is that how you think this should go? I think it should. And that's based on decisions previously made by this court, as well as other courts in which the court has held that if more than one error, more than one area of deficient performance was made by defense counsel, the proper analysis is to look at the cumulative impact of those errors. So yes, if this court finds more than one area of deficient performance, then prejudice must be looked at based on the cumulative effect of those errors rather than individually. So if it is a de novo review, as you're arguing, still the standard would be a, what, a Breck standard? Yes, Your Honor. Whether or not there was an injurious impact on the jury's verdict. Yes, Your Honor. Language to that effect. But it would be Breck. Did it have to be Breck? Well, it's still analyzed under Strickland for the cumulative impact, which is whether or not the cumulative impact of the errors would have likely or had a reasonable probability of resulting in a different outcome. Reasonable probability being whether or not the court used confidence in the outcome. And Strickland deals, as I understand it, solely with ineffective assistance of counsel and errors made by counsel. So it's not errors made by a court. Correct. And the only errors being alleged at this level are the errors of counsel. There are no judicial errors that are raised in this appeal. Okay. Why don't we hear from the state and then I'll give you some time for rebuttal. Thank you. Good morning, Your Honors. May it please the court. My name is Katrina Samuels, and I represent the respondent's appellees in this matter. Respondents ask that this court affirm the decision of the federal district court and hold that Melendez is not entitled to federal habeas relief for the following reasons. First, trial counsel was not ineffective for conceding to manslaughter. Counsel wasn't deficient because Melendez never testified at trial. During the state habeas evidentiary hearing, Melendez confirmed that he never explicitly told his counsel that he did not want to concede to manslaughter. Counsel's concession did not contradict what counsel had said during opening statements, which was that there was a murder, but it was unintentional and accidental. Well, if it was a voluntary manslaughter concession, that is a contradiction, right? Well, no, Your Honor. It's not a contradiction because counsel made it clear during opening statement that it was a homicide, that it was a murder, but it was unintentional and accidental. But voluntary manslaughter is not unintentional. Well, Your Honor, the jury wasn't instructed on involuntary manslaughter. So, yes, he could say that it was unintentional and accidental. And then he also stated in the closing argument three times, says voluntary manslaughter. Yes, Your Honor, but counsel was referring to involuntary manslaughter. How would the jury have known that? The jury would know that based off of the jury instructions, which they were providing, that it was involuntary manslaughter that he was referring to. And how was that argued to the jury? I'm sorry, I misspoke.  Establish that Melendez killed his wife. There was testimony from the son. There was testimony from a co-worker, as well as a neighbor in the apartment that heard the gunfire go off. There was Melendez's inconsistent statements that he made during the 911 call in conflict with the statements that he told law enforcement. His actions 15 hours after the murder occurred, as well as expert testimony. And under these circumstances, counsel made a strategically sound decision to argue in closing that the current murder is manslaughter and not murder. Not only was counsel not deficient, but Melendez... Let me just stop you right there. Is there anything in the record that shows that they conferred with Melendez, that counsel was going to do that in closing argument? No, Your Honor. The record shows, based on the state habeas evidentiary hearing, when Melendez himself testified, he said that he did not confirm that he explicitly told counsel that he did not want to concede to manslaughter. Well, didn't counsel have some... If they were going to concede to manslaughter, either voluntary or involuntary, or any concession, didn't they have an obligation to speak with him about it? Well, Your Honor, they do have an obligation to speak to him. But again, the record does not show that he in any way did not agree with the concession. Don't they have an affirmative obligation to sit down with him and say, this is what we plan to do? Yes, Your Honor. Just discuss it with him. Right. Yes, Your Honor. But the record does not show otherwise. It does not show that he did not agree with the concession. No, no, no, no. But does it show that they sat down with him and said, this is what we plan to do? Whether or not he agreed to it, ignored them? No, Your Honor, it does not. And also, not only was trial counsel not deficient, but Melendez wasn't prejudiced. Due to the overwhelming evidence, the outcome would not have been different even if counsel had not made the concession statements during closing. Also, trial counsel was not ineffective for stipulating to the admission of the autopsy report and not objecting to the testimony of a different coroner. During cross-examination, Dr. Sims conceded that he could not opine the issue of intent. He also agreed that the consumption of alcohol does impair one's judgment, and he admitted that he could not specifically state how the victim's head was positioned when she was fatally shot. Dr. Sims offered his own knowledge based on non-testimonial record evidence, such as photos and x-rays, and he was cross-examined on all of those points. Counsel also confirmed that she made the strategic sound decision to stipulate to the admission of the report as well as the testimony of Dr. Sims. The autopsy report did not impact counsel's defense, which was that there was alcohol involved in a mishandling of a firearm. The bullet wound and the stippling, which was found in the photos as well as the x-rays, they were there whether or not counsel stipulated to the report or not. Third, counsel was not ineffective in the investigation and preparing of the victim's sister's testimony. The record supports the finding that the information as far as the victim's sister's testimony about the bad acts, it was a surprise that was sprung on counsel in the middle of the correct examination. But that's because they hadn't interviewed her because they had messed up by not getting an investigator, right? Well, Your Honor, they didn't mess up because when you're looking at strickland and deficient performance, you're looking at whether counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. And so in other words, when you're looking at strickland, it's about whether a lawyer made a reasonable decision that a particular investigation was not necessary. And how would it possibly be reasonable to not investigate the sister of the victim, who's the one who's likely to have some sort of motive or at least be mad at him for killing her or something? I mean, that's it's a key witness about whether he had a motive, isn't it? Well, yes, Your Honor, but the record shows that counsel made the reasonably sound decision not to interview the victim's sister. The victim's sister's testimony... I'm sorry to interrupt you, but I thought he actually tried. He called the victim's sister and he said the victim's sister did not want to speak with him. Yes. And at the time before trial, I guess the victim's sister, she was told, I mean, counsel was told that basically the testimony was largely insignificant. Arguably, there would be no reason to interview the sister based on what the defense lawyer was told that the testimony would be. It was only in retrospect when they surprised the defense counsel in the middle of trial, that it was clear that there would be devastating... I don't even characterize it as devastating, actually, but I don't want to get into that. It was clear that the testimony would go beyond that. But I think there is evidence in the record that the lawyer tried to interview the sister. She wouldn't speak to him, which is plausible, since he had given the nature of the relationship and that he had murdered her sister. Was there ever a finding of fact made? I know that the sisters claimed that that wasn't true, that she would have been willing to speak with him. Was there ever a finding of fact made as to whether or not who was telling the truth? Well, Your Honor, based on the state habeas evidentiary hearing, counsel testified that yes, they did initially, with the assistance of an investigator, contact the victim's sister. Wasn't it without? Isn't that the whole point? They didn't have an investigator who could be a witness to whether she refused or not? Well, yes, Your Honor, but they did in the first initial reach out, which was to speak to the victim's son. And then on the second attempt, when counsel reached out, they did. Counsel did not have an investigator present. And so as far as with that issue, which you're referring to, Your Honor, counsel was not deficient because the witness's testimony was strictly about the admissibility of the camera that the witness that the victim's sister turned over to law enforcement. And also during the state habeas evidentiary hearing, counsel also made it known that this witness in particular did not testify during the preliminary hearing. And there were no statements made by the witness in any of the police reports. And so, again, counsel was sprung with this issue about the prior bad acts. And then on top of that, counsel also made sure to have Melendez's wife testify. And she testified to the fact that during their divorce proceedings, during their child custody proceedings, that she did not have any issues with Melendez, even though her infidelity was the cause of the divorce. And as you said, Judge Corman, it's only the benefit of hindsight that Melendez can fault counsel. But again, Strickland cannot be applied in that manner. But wasn't there a professional norm that you should always contact a witness with an investigator present? You should have an investigator present. But in this case, counsel, counsel was not deficient in not having an investigator present in terms of reaching out to that witness. But isn't that the definition of deficient performance is you're violating a professional norm? Well, no, it's it's basically on prevailing. I mean, it's under prevailing professional norms. But counsel's actions in this particular set of circumstances was not objectively a reason. What was this person? What was Eggleston? What was she a witness to? She wasn't a witness to the crime. She didn't she was going to testify as to what could be described as a relatively totally insignificant fact. I'm not I'm not it's not clear to me that a that a that a lawyer has to interview anyone who was on a witness witness list of the prosecutor, even if the testimony is totally insignificant and not terribly prejudicial. And here's just a short comment. Based on the overwhelming evidence, this witness's testimony wouldn't have wouldn't have affected the verdict in any appreciable way. The witness's testimony was basically that her sister was unhappy with the divorce. The sister wanted to leave, but she was afraid that Melendez would take her son. And also when the witness would call to speak to her sister, Melendez would interfere and not allow her to speak to her sister. But but during closing, during closing arguments, counsel made it clear that the prosecution did not prove that any of those statements were actually true. They were mainly speculation. And given the trial court's ruling, Melendez was in prejudice because the issue would have still been the evidence would have still been admitted, even if counsel had the investigator filed the motion and received an order from the court to have this witness testify. And even if this even if counsel went about those meetings as far as getting a witness and was able to, per se, more effectively cross examine the witness, even that conclusion requires mainly speculation. And lastly, trial counsel was not ineffective for hiring an expert to testify at trial. The issue at trial was whether Melendez intentionally killed his wife during the state habeas evidentiary hearing. Trial counsel confirmed that a psychological expert was not needed because the defense was based on intent and there were no signs of psychological issues or mental defects. Counsel also confirmed that a forensic toxicologist was not needed because counsel did not need an expert to testify about what it's like to be heavily intoxicated. And also counsel confirmed that a firearms expert wasn't needed because counsel saw the firearm was fired at a distance. And also the force used to pull the trigger did not matter as to the explanation as to why Melendez had the firearm in his hands in the first place. And neither Dr. Sims nor the firearms expert Angel Moses testified that the shooting was intentional. Instead, instead, the prosecution pulls facts from both of those experts testimonies and made their case for specific intent. Could I ask as far as with Shiro's report, excuse me, could I ask you to interpret the footnote about cumulative error? What do you think the Nevada Supreme Court reached? Which prongs? With which prongs with the you think as to cumulative error, did the court reach prejudice? Did it only reach whether there were errors? What does this footnote mean? And your under the footnote means that they were just that they just addressed the the errors. So we review prejudice de novo then. Yes, sure. And so with Dr. Shiro's report, Dr. Shiro did not dispute Dr. Sims testimony about the trajectory of the bullet. Also, Shiro's report stated that the bullet was at a downward angle angle, which could be explained by the tilting of the victim's head. However, counsel already addressed that point during recross examination with Dr. Sims, because Dr. Sims confirmed that he could not explicitly state how the victim's head was positioned before she was fatally shot. And also, Dr. Shiro did not test Melendez's gun. So his report could not demonstrate that Angel Moses's testimony regarding the distance or the trigger pull was inaccurate. Also, Melendez wasn't prejudiced because if defense attempted to show that the gun if cocked required only a slight amount of pressure, they would still need to explain why Melendez cocked the gun before shooting his wife in the head in the first place. And also, Melendez fails to demonstrate that Shiro's report that if it had been presented to the jury, the results would have been different at trial. And your honors, if you do not have any more questions, I submit. Okay, thank you. Thank you, your honors. We'll hear from the petitioner. Two minutes. Oh, you got to 12. You got to you had to 12. I'm sorry. I don't want to shortchange you. Thank you, your honor.  First of all, Florida versus Nixon absolutely requires defense counsel to consult with the client before making any concessions. That was not done here. Moreover, reading the testimony of the post-conviction evidentiary hearing, it doesn't even appear that the concession that was made during the defense closing argument was part of a broad strategy. Lead counsel who made the opening statement testified repeatedly that the theory of the defense was that the shooting was accidental and quote, not a criminal act. She never believed that this was any sort of manslaughter, let alone murder. It was her co-counsel that made this sudden and unplanned concession during closing arguments. There was never a consultation with Mr. Melendez, nor would he have consented to it. And the departure in the closing argument was directly contradictory to the statements that were made during opening arguments. Second, and touching briefly on the testimony of Ms. Eggleston. In this case, the fact that Ms. Eggleston didn't testify during a preliminary hearing or make any statements to the police made it more necessary that she be investigated with an investigator present, not less likely. It was not reasonable for counsel to rely on the assumptions or assurances made by the state, which were then suddenly changed shortly before trial. It's not reasonable for counsel to rely on assurances by the state. And I don't quite understand that. The state is obligated to provide information about what a witness is going to testify to. And the state failed to do that. Quite frankly, given what she knew, I don't see why she needed even to attempt to contact this witness because this witness was not going to give any testimony that was consequential. And counsel was notified shortly before trial that that was not the case. She had been emailed by the prosecution who said There was never was never produced. It wasn't produced. Nevertheless, those were So the prosecutor said. Well, and if the prosecutors were lying to the courts about that, that that is in and of itself very troubling. Troubling the whole this whole this whole thing is troubling. But I don't, I don't quite see, you know, the argument that she should have had an investigative present assuming there were there was consequential testimony to be able to rebut to assume that the witness would deny something that was said to her and therefore the witness would be able to testify is somewhat far fetched. It wasn't given In this case, she did a attempt to interview her and be at the time she did. There was no this witness was not was not told was told that the evidence that was going to be produced was insignificant. Your Honor, when she attempted to investigate her. She did not have an investigator present when she attempted to speak with Miss Edelstein. So later when Miss Edelstein stated that she was willing to cooperate with the defense. There was no way to impeach her credibility. Or show of eyes. Way to impeach her credibility. But the question. The question is, I asked you, was there any finding of fact made. There's no ways to impeach her credibility. She was after all the sister of the victim who had been murdered by the defendant and and There was at least testimony that So I don't understand why you can say there was no testimony to to impeach her credibility. But in any event, was there any finding of fact made on this on this issue. If by this issue you're referring to the The email notification by the state. I don't believe there were any findings made. Also, the testimony of the of the lawyer that she did call the sister in any event. And the testimony of the sister subsequently that she did agree, not that she didn't agree. Your Honor, I don't know that there were any specific factual findings, nor do I think it matters. Either Miss Edelstein was lying and therefore should have been impeached with use of investigator. Or had she be willing to speak with the defense, then the defense was even more deficient for not utilizing that opportunity. Miss Craig testified at the evidentiary hearing that she knew Miss Edelstein didn't like Mr. Melendez and would not have anything favorable to say about him, which again made it more important to investigator and find out what damaging information, she might have to say about Mr. Melendez. This was the murder victims or excuse me, the victim's sister. And was in a unique position have information about the marriage. This was not a benign witness and she should have been investigated by the start. And it seems to me that the DA was also at fault. I certainly would agree with that, Your Honor. But again, new reliance on the district attorney's assurances in a first degree murder case, specifically with regards to a victim in such a witness in such a unique position to have information about this case was patently unreasonable. And for all of these reasons, we would ask that the decision of the district court be reversed and that this court grant a writ of habeas corpus to Mr. Melendez. Thank you, counsel. We appreciate both arguments this morning. Interesting case and the matter is submitted at this time.  Thank you, Your Honors.
judges: PAEZ, FRIEDLAND, Korman